UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
DARRELL HIPPE,

                              Plaintiff,                    SUMMARY JUDGMENT

              v.                                           02-CV-0086 (ILG)

LIFE INSURANCE COMPANY OF NORTH
AMERICA, and CONTI-GROUP
COMPANIES,

                              Defendants.
-----------------------------------------------------x

GLASSER, United States District Judge:

On the basis of the facts and conclusions of law as stated in this court's

Memorandum and Order dated July 31, 2003, see Hippe v. Life Ins. Co. of North

America, No. 02-cv-86, 2003 WL 22220749 (E.D.N.Y. July 31, 2003) (a true and correct

copy of which is attached hereto as Exhibit A), and this court's Findings of Fact

Regarding Plaintiff's Mental Disability, dated December 29, 2006 (a true and correct

copy of which is attached hereto as Exhibit B), and having determined that no genuine

issues of material fact remain unresolved, it is hereby:

ORDERED that the District Clerk shall enter Judgment in favor of the plaintiff

Darrell Hippe as to the first and second causes of action alleged in the underlying

complaint; and it is further

ORDERED that said Judgment shall declare that the defendants are obligated to

continue to pay disability benefits to the plaintiff until his retirement age or until such

time as he can return to work; and it is further

ORDERED that the plaintiffs shall recover from all defendants monetary

damages as follows:

1. All disability insurance benefits owed to the plaintiff under the terms of the group insurance policy issued by the defendants to Continental grain company;

2. Pre-judgment interest from January 13, 1999 until the date of this judgment; and

3. Attorney's fees, court costs, and all other reasonable costs incurred in the prosecution of this action.[1]

The plaintiff's request for punitive damages is hereby DENIED.

SO ORDERED.

Dated:  Brooklyn, New York
        February 6, 2007

_____/s/_____

I. Leo Glasser
United States Senior District Judge

---

[1] In accordance with the Second Circuit's instruction in <u>New York State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1147-1148 (2d Cir. 1983), plaintiff's counsel is instructed to submit to the court contemporaneous time records specifying, for each attorney, the date, the hours expended, and the nature of the work done for all work on this case.

Copies of the foregoing were sent electronically  on this day to:

**Counsel for Plaintiff**
John Palmeri
Palmeri & Gaven
55 John Street
New York, NY 10038

**Counsel for Defendant**
Kevin Horbatiuk
Russo, Keane & Toner, LLP
26 Broadway
New York, NY 10004

# **<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

DARRELL HIPPE,

                             Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH
AMERICA, and CONTI GROUP COMPANIES,
INC.,

                             Defendants.

-------------------------------------------------------------x

**MEMORANDUM AND ORDER**
02-CV-0086 (ILG)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ AUG 13 2003 ★
BROOKLYN OFFICE

GLASSER, District Judge:

## SUMMARY

Plaintiff Darrell Hippe is a former employee of Continental Grain Company, the predecessor in interest to defendant Conti Group Companies ("Conti Group"), which provided long term disability benefits for its employees pursuant to a self-insured group insurance plan. Conti Group contracted with defendant Life Insurance Company of North America ("LINA") to administer the plan. Hippe applied for benefits on the grounds that he is infected with HIV, and suffers from diabetes mellitus, cardiomyopathy with atrial fibrillation, hypertension and hyperlipidemia. Defendants moved for summary judgment, plaintiff opposed the motion and cross-moved for summary judgment in his favor; oral argument was heard on both motions.

Although many of the underlying facts are not in dispute, the parties draw different inferences from these facts regarding the extent and progression of Hippe's medical condition. Hippe claims that he was unable to perform his job when he left Conti Group's employment. Defendants state, however, that Hippe was capable of performing his job, and assert that even if Hippe eventually became so disabled as to be unable to perform his job, that disability did not

begin until after he left his job and that his disability did not continue during the first six months

after his employment ended (as required by the disability plan).  Because resolving these motions

in favor of one party would require drawing inferences against the other, both defendants' motion

and plaintiff's cross-motion are denied.

## BACKGROUND

Both parties submit "Statements of Material Facts" pursuant to Local Civil Rule 56.1 in

support of their respective motions, but neither party submits a counter-statement as required by

Local Rule 56.1(b).  This memorandum will thus treat the specific assertions in both statements

as admitted by the other party, *see* Local Rule 56.1(c), unless the record establishes otherwise.

### *The Terms of the Disability Plan*

The disability plan states that

> "Totally Disabled" or "Total Disability" shall mean, (a) during the
> first 30 months of any period of continuous disability requiring the
> regular care of a licensed physician, that the participant is unable,
> because of accidental bodily injury or sickness (whether
> occupational or non-occupational), *to perform any and every duty
> of his occupation . . . .*

(Disability Plan, §2.18 (Exhibit 1 to Affidavit of Richard Lodi, sworn to October 17, 2002)

(emphasis supplied).)[1]  In other words, a participant is entitled to receive benefits during the first

30 months of his or her disability if he or she becomes so disabled that he or she cannot perform

the duties of the job at Conti Group.[2]  (*See* Def. R. 56.1 St. ¶3.)

---

[1]     Exhibit 1 is the entire administrative file compiled by LINA in reviewing Hippe's
application for benefits.

[2]     A plan participant can continue to receive benefits beyond those 30 months only if
they are unable to engage in any job for which the participant reasonably is suited.

The disability plan describes how someone who is totally disabled (as defined by the disability plan) may be eligible for benefits: "If a Participant is Totally Disabled during and beyond his Qualifying Period, he shall be paid a Monthly Disability Allowance for the period of his Total Disability computed from the first day following completion of his Qualifying Period and continuing thereafter until" they are no longer "Totally Disabled," death, or attaining the age of 65 (with certain exceptions). (*Id.*, §5.1.) The "Qualifying Period" is defined as "a period of six (6) months from the first day of absence by reason of Total Disability." (*Id.*, §2.16.)

To make a claim for disability benefits, a participant first provides written notice of a claim "within 30 days after the commencement of any Total Disability or as soon thereafter as is reasonably possible." (*Id.*, §5.8.) After giving notice, "[w]ritten proof of the Total Disability . . . shall be furnished . . . within 90 days after the end of the month or lesser period for which the first Plan benefits are payable." (*Id.*, §5.8.1.) "Upon receipt of due proof, the Administrative Committee or its designee shall direct the Trustee to commence payment of the Monthly Disability Allowance then payable to the Participant." (*Id.*, §5.8.3.) The plan documents do not specify the nature or quantum of proof necessary.

### Hippe's Medical Condition and Claim for Benefits

Hippe was a senior traffic coordinator with Conti Group and a covered employee under the Conti Group Disability Plan. (Def. Rule 56.1 St. ¶1.) On July 13, 1998, Hippe stopped working. (*See* Pl. Rule 56.1 St. ¶1.) By letter the next day, Hippe's consulting physician, Dr. Michael Landor, wrote a letter to Conti Group stating that Hippe was under his care for "HIV Infection, Diabetes Mellitus, Atrial Fibrillation, Hypertension and Hyperlipidemia." (*See* Ex.1, at 0055.) Dr. Landor has been treating Hippe since November 19, 1996. (*Id.*, at 0051.) Dr. Landor further stated:

> His condition has progressed to the point where he is unable now
> to perform his work duties or, the associated commuting. He
> requires frequent [m]edical monitoring and many medications that
> necessitate strict adherence to a fixed schedule. It is in my
> [m]edical opinion that he is no longer able to return to work and
> should apply for long term disability.

(*Id.*, at 0055.)

Hippe later submitted a claim to LINA for long term disability benefits. (Def. Rule 56.1

St. ¶2.) With that claim application, dated November 29, 1998, Hippe submitted a statement

from Dr. Landor describing Hippe's medical condition and his physical limitations. Dr. Landor's

evaluation stated that (1) Hippe was not capable of performing his occupation, but that (2) Hippe

was capable of performing *some* otherwise undefined occupation. (Ex. 1 at 0052A.)

According to Hippe, he visited Dr. Landor monthly and was taking ten different prescription

medications – nine of which he was taking daily. (*Id.*, at 0041.)

### *The Occupational Requirements for Hippe's Job*

Hippe described his job duties as acquiring documents for shipment of exports, as well as

other duties relating to hosting visitors and other minor office functions, and indicated that his

primary tools are a computer and photocopier. (*Id.*, at 0043.) According to the human resources

manager, Hippe handled all letters of credit for the department, prepared and executed all

"documents related to contracts," checked on inventory, and handled all barge payments. (*Id.*, at

0026.) Hippe's job required him to sit, stand, and walk for a number of hours each day, but the

amount was variable, and he would occasionally need to bend or stoop, squat, climb, reach above

shoulder level, kneel and balance, as well as occasionally lift and carry objects weighing up to

ten pounds. (*Id.*, at 0026-27.) Finally, Hippe's job required that he perform a number of less

4

tangible aptitudes, including performing under stress and in "situations demanding the precise attainment of set limits, tolerances, or standards." (*Id.*, at 0029.)

### Dr. Landor's Initial Medical Evaluation for LINA

LINA also requested additional information from Dr. Landor. On January 7, 1999, Dr. Landor completed an assessment for LINA of Hippe's physical abilities. Dr. Landor concluded that Hippe was capable of sitting for eight hours a day, standing for two hours a day, and walking for one hour a day. (*Id.*, at 0037.) Dr. Landor further concluded that Hippe could lift and carry up to ten pounds continuously, could occasionally climb, stoop, crouch, kneel, crawl, push and pull, and could undertake certain other physical tasks not relevant here. (*Id.*) LINA did not request Dr. Landor's opinion on the non-physical job requirements.

Dr. Landor also submitted a copy of his medical chart for Hippe from June 1998 through the rest of the year. The chart indicates that on July 14, 1998, Hippe complained to Dr. Landor about feeling tired, decreased energy, decreased work tolerance, being frequently out of breath, and being depressed. (*Id.*, at 0024; *see id.* at 0017 (summarizing chart reports).) On September 8, 1998, Dr. Landor noted that Hippe felt well and was dieting to lose weight, and found no symptoms of congestive heart failure; extensive medication, however, was still necessary. (*Id.* at 0024-23.) Many of the notes relating to this examination are not fully legible, at least to the untrained eye because of the handwriting. (*See id.*) Dr. Landor's handwritten notes of another examination on September 24, 1998, are similarly difficult to read. (*See id.* at 0023.)

On October 27, 1998, Dr. Landor notes that there is "too much bloating," and that Hippe's weight has increased, as well as noting "No DOE[3]/orthopnea," presumably meaning that

---

[3]        DOE apparently refers to dyspnea on exertion, or labored breathing.

Hippe did not report labored breathing upon exertion or orthopnea. (*Id.*) A vital statistics chart for Hippe indicates his weight fluctuated during 1998 from 303 to 328 pounds. (*Id.* at 0025.) Other notations from that examination are not legible. (*Id.*)

Finally, a December 1, 1998 examination states that Hippe suffered DOE after only 2 or 3 blocks, and that Hippe suffered from occasional increases in fluid retention. (*Id.* at 0022.) Hippe's HIV was stable and unchanged. (*Id.*)

***LINA's Initial Denial of the Claim***

LINA initially denied plaintiff's claim by letter dated February 8, 1999 because "it appears that you have the physical abilities to perform the duties of your own occupation." (Lodi Aff. Ex. 1, at 0017; *see* Def. Rule 56.1 St. ¶4.) The letter further stated:

> This has been determined by comparing Dr. Landor's office note and Physical Abilities Assessment to the Occupational Requirement as reported by your Employer. Although you are overweight and may have multiple diagnosis [sic], these conditions appear to be stable or asymptomatic.
>
> In July 1998, you reported symptoms of fatigue, shortness of breath, and decreased energy. By October 1998, these symptoms seem to have been resolved. Dr. Landor's office notes and Physical Ability Assessment do not indicate restrictions great enough to prevent you from performing the duties of your own occupation.

(*Id.*, at 0017.)

In making this determination, LINA did not have any medical doctor (or similarly trained personnel) review Dr. Landor's notes and evaluation, nor did LINA request that another doctor examine plaintiff. (Pl. Rule 56. 1 St. ¶4.)

6

### Hippe's Appeal of the Claim Determination

On March 7, 1999, plaintiff appealed LINA's decision to deny his claim. (Def. Rule 56.1 St. ¶5; Pl. Rule 56.1 St. ¶5.) Hippe explained that he could not work during the entire waiting period, that he was debilitated due to his heart condition, high blood pressure, shortness of breath and also due to the residual effects of a hernia, and that he also suffered many negative side effects from the multiplicity of prescription medicines prescribed for HIV, including dizziness, fatigue, diarrhea, headaches, upset stomach, nausea, skin rashes, and drowsiness. (Ex. 1, at 0011-12.) Hippe further stated that his ability to undertake common daily tasks, such as cleaning, cooking or other chores, was significantly reduced. (Ex. 1, at 0012.)

Plaintiff included with his appeal a letter dated February 16, 1999, from Dr. Landor elaborating upon his previous reports. (*See* Ex. 1, at 0014.) Dr. Landor stated that in addition to Hippe's HIV, diabetes mellitus, cardiomyopathy and atrial fibrillation, Hippe has also been suffering from "morbid obesity, complicated by hyperlipidemia and abdominal incisional hernia." (*Id.*) Dr. Landor stated that Hippe's cardiomyopathy further deteriorated over the prior year and Hippe became "chronically symptomatic." (*Id.*) Dr. Landor also stated Hippe's physical capabilities had deteriorated further, noting that Hippe needed to lie down frequently after only half an hour of standing or two hours of sitting, or a block of walking. (*Id.*)

On March 18, 1999, LINA acknowledged the appeal and told Hippe that Dr. Landor's letter did not address whether his disability existed from the last date of work to the present, and that Dr. Landor did not provide documentation to support Hippe's change in physical ability. (Ex. 1, at 0009.) Accordingly, LINA requested additional medical documentation from Dr. Landor regarding his disability "from the last day worked through the present." (*Id.*; *see* Def. Rule 56.1 St. ¶6.)

7

Dr. Landor submitted a brief letter dated April 14, 1999, that stated in its entirety:

> In following of my letter of 2.16.99, I would like to update you
> with my revised evaluation
>
> Mr. Hippe's effort related problems (Dyspnea and Fatigue) did in
> fact start in May, 1998 and has been on going to the present.
>
> His current condition requires frequent resting, which makes him
> unable to sit more than 2 hours, walk and carry any weight, stand
> more than 10-15 minutes, walk more than a few minutes.
>
> Any further questions, comments or concerns please feel free to
> contact me.

(Ex. 1, at 0008.)

LINA decided that there was insufficient documentation to support plaintiff's claim, and

upheld its previous decision. (Def. Rule 56.1 St., ¶8; Ex. 1, at 0002-3.)

This suit followed the exhaustion of these administrative reviews. Defendants claim that

the record demonstrates that Hippe was not totally disabled as defined in the disability plan

because his own doctor stated that he was capable of satisfying the physical requirements of the

job and because he was not disabled at all times during the six-month qualifying period. Hippe

claims that the denial of disability benefits was arbitrary and capricious because it ignored his

doctor's statements regarding his medical condition and is therefore unsupported by substantial

evidence. Hippe further claims that LINA should have sought an independent medical

examination before making a decision that conflicted with Dr. Landor's diagnosis, and that the

failure to seek such independent review warrants summary judgment in his favor.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions . . . together

with the affidavits . . . show that there is no genuine issue as to any material fact and . . . the

8

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985) (internal quotation marks and citations omitted). In deciding a summary judgment motion, a court should not resolve disputed issues of fact; rather, it simply must decide whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir. 1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Id.*, at 248-49. The motion "will not be defeated merely . . . on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989).

Cross-motions for summary judgment are evaluated in the same manner as individual motions for summary judgment. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Each motion is considered independently of the other; when evaluating each, the court considers facts in the light most favorable to the non-moving party. *See id.*

**I.     Standard of Review of Denial of Benefits**

The parties disagree about the standard under which this Court should review defendants' denial of benefits – oddly so, because the parties each advocate standards that are favorable to the other party. Plaintiffs seem to believe that this Court may review the decision to determine if it

9

was arbitrary and capricious (*see* Pl. Mem. at 7-8), whereas defendants acknowledge that LINA's decision should be reviewed *de novo*. (Def. Reply Mem. at 2.) Defendants are correct.

"As a general rule, a denial of benefits is to be reviewed by the court *de novo* unless the plan gives the administrator or fiduciaries discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Montesano v. Xerox Corp.*, 117 F. 3d 147, 155 (2d Cir. 2001). "The party seeking deferential review must prove that the arbitrary and capricious standard applied." *Id.* A review of the plan does not reveal any such grant of discretion, and certainly Hippe does not prove that the arbitrary and capricious standard applies. Accordingly, this court reviews Hippe's claim for benefits *de novo*.

In reviewing the claim *de novo*, courts "must decide for themselves what a term means" and "must apply traditional principles of contract interpretation." *Id.* at 156. The Supreme Court has stated in this regard:

> As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation. "The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust *as the court may interpret them*, and not as they may be interpreted by the trustee himself or by his attorney." 3 W. Fratcher, Scott on Trusts § 201, at 221.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989) (emphasis added by the court).

As to the scope of the record to be reviewed, this Court's *de novo* review "is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence." *DeFelice v. American Int'l Life Assurance Co. of New York*, 112 F.3d 61, 67 (2d Cir. 1997). Good cause might be shown where the claims administrator suffered from a conflict of interest, such as where the board reviewing the claim "was comprised entirely

10

of [defendant's] employees" that did not rely upon "established criteria for determining an appeal." *Id.* at 66. Since plaintiff did not seek to establish good cause for submitting additional evidence, however, this motion will be based solely upon the administrative record before LINA.

## II.    Review of Hippe's Claim

Since there is little dispute about the facts in the administrative record, a discussion must begin there. In favor of finding that Hippe is "Totally Disabled," he suffers and suffered at all relevant times from HIV, diabetes mellitus, atrial fibrillation due to cardiomyopathy, hypertension and hyperlipidemia, as well as from morbid obesity. Hippe also appears to be suffering from the aftereffects of an abdominal incisional hernia, although the record is less than clear on this. Moreover, Dr. Landor confirmed that Hippe was suffering from dyspnea and fatigue as early as May 1998.

### A.    Hippe's Ability to Perform the Duties of His Occupation

In denying Hippe's claim, LINA pointed to two perceived faults. First, LINA noted that Dr. Landor stated that Hippe could perform the job's *physical* demands, such as sitting, walking and standing with occasional lifting of light objects. In support of the motion, Defendants focus intently upon this same comparison. (Def. Mem. Supp. S.J. at 3-4.)

The fact that a claimant can perform *some* duties does not determine if a claimant is "totally disabled," even where, as here, the agreement defines total disability as being unable "to perform any and every duty of his occupation." (Plan §2.18.) The courts "have repeatedly held that 'total disability' occurs where a professional is unable to perform any *substantial* part of his ordinary duties, even though he can still perform some of them." *Liebowitz v. Mutual of Omaha Ins. Co.*, 71 Misc.2d 838, 839, 337 N.Y.S.2d 314, 316 (N.Y. City Civ. Ct. 1972); *see Matza v. Empire State Mut. Life Ins. Co.*, 50 A.D.2d 554, 555, 375 N.Y.S.2d 578, 581 (1st Dep't 1975)

11

(holding that company executive who spent 90% of time communicating with customers who lost use of voice was totally disabled despite clause requiring "complete inability . . . to perform each and every duty"). As one of the leading treatises states:

> A policy which relates disability to the inability to work at one's usual occupation does not require a total helplessness of the insured even though the policy be broadly drawn to require an inability to perform 'any and every duty.' To the contrary, it is sufficient that the insured cannot perform all the substantial and material acts necessary to the prosecution of his or her business or occupation in a customary and usual manner.

10 Couch on Insurance §147:107. Determining whether a claimant is totally disabled is normally a question of fact. *See Arbour v. Commercial Life Ins. Co.*, 240 A.D.2d 1001, 1003, 659 N.Y.S.2d 525, 526 (3d Dep't 1997).

LINA's evaluation of Hippe's claim, however, focused only on some of the requirements of the job, such as his physical ability to stand, walk or carry modest weights. LINA neglected, however, what are arguably equally material aspects of Hippe's job – mental, organizational tasks such as handling letters of credit, assuring that contracts are executed and performed, paying for barges, and the like. As the human resources manager reported, Hippe's job required him to cope with and perform under stress and achieve precise standards under those conditions. (Ex. 1, at 0029.)

Although LINA requested an evaluation from Conti Group of the job requirements that included both physical and mental tasks, LINA's request to Dr. Landor was limited solely to the physical tasks. Therefore, the only evidence regarding Hippe's ability to meet these requirements must come from Dr. Landor's opinion on July 14, 1999, that Hippe could no longer perform his job, (*id.*, at 0055), and from Hippe's own statement that, in addition to the medical conditions diagnosed, problems like "difficulty breathing, extreme fatigue, dizzyness [*sic*], and lack of

12

concentration" prevented him from performing his job. (*Id.*, at 0041.) A factfinder could reasonably infer that an employee who has dizzy spells, is overcome by fatigue, or is otherwise unable to concentrate on the tasks at hand could not perform a job that involves significant financial tasks and that requires working under stress and achieving precise standards.[4] Therefore, defendants are not entitled to summary judgment.

However, summary judgment cannot be granted to plaintiff based on the current record. Although the difficulties of someone in Hippe's medical condition seem obvious, such a finding requires the Court to infer that those medical problems would prevent Hippe from carrying out the job requirements mentioned above. Since a court must draw inferences against the party seeking summary judgment even when there are cross-motions, *see Morales*, 249 F.3d at 121, summary judgment cannot be granted to Hippe.

### B.    The Length of Hippe's Disability

Second, LINA also based its rejection of Hippe's claim because it believed that Hippe did not establish that he was "unable to perform [his] job from [his] last day of work throughout the benefit waiting period." (Ex. 1, at 0003.) However, there is ample evidence to permit a factfinder to conclude that beginning on July 14, 1999, Hippe was disabled.

Beginning in early 1999, Hippe's health began to decline due to complications arising from cardiomyopathy. (Ex. 1, at 0014 ("His situation has further deteriorated over the last year since his cardiomyopathy has decompensated, and has become chronically symptomatic."))

---

[4]    Other courts have noted that stress negatively impacts persons with HIV and that stress reduction is very important to treating HIV. *See, e.g.*, *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 186 & 209 n.18 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003); *Hernandez v. Prudential Ins. Co. of America*, 977 F. Supp. 1160, 1168 (M.D. Fla. 1997); *Anderson v. Sullivan*, 806 F. Supp. 134, 138 n.2 (E.D. Tex. 1992).

Hippe's last day of work was July 13, 1999. The next day, July 14, 1999, Dr. Landor reported that Hippe suffered from most of the problems noted above and that his condition had progressed to the point where Hippe was unable to perform his work duties or the associated commuting. (*Id.*, at 0055.) As of that date, Hippe required frequent medical monitoring and had to strictly adhere to a fixed schedule for his medications. (*Id.*) Dr. Landor opined that Hippe was no longer able to work as of that date. (*Id.*)

The analysis does not end there, however. The plan requires that a participant be "Totally Disabled during and beyond his Qualifying Period" in order to qualify for benefits. (Plan §5.1.)[5] As LINA noted, Hippe's condition appeared to improve somewhat in his September checkup, and Dr. Landor did not again record significant fatigue-related complaints from Hippe until December 1999, when serious problems with dyspnea were noted.

Hippe's lack of reported fatigue on one specific day would not otherwise undermine his claim to total disability. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 n.7 (3d Cir. 1997) (holding that plan participant suffering from chronic fatigue syndrome was totally disabled notwithstanding physical evaluations that patient could undertake some occasional physical activity some of the time). Moreover, to conclude from Dr. Landor's partially legible notes that Hippe was therefore not disabled during the six month waiting period disregards Dr. Landor's other statements. Dr. Landor noted, for example, that throughout this time period Hippe's cardiomyopathy was "chronically symptomatic" and that his dyspnea and fatigue began in May 1998. (Ex. 1, at 0014 and 0008.)

---

[5]    Because the disability plan provides for payment of disability benefits only if the participant is totally disabled during the first six months of absence (*see* Disability Plan §§ 2.16 and 5.1), Hippe's arguments that LINA should have considered the status of his disability after the six month period ended (Pl. Mem. at 17-18) find no support in the plan language.

In order to grant judgment, the Court would have to infer that Hippe's symptoms were absent on a regular basis during the six-month Qualifying Period based upon some references in Dr. Landor's notes.  Since such inferences cannot be drawn in favor of a moving party, summary judgment is inappropriate.

## III.    LINA's Failure to Consult with Independent Medical Professionals

As Hippe notes, it is beyond cavil that a plan administrator has a duty to investigate a claim for benefits and develop the reasonably available evidence.  *See, e.g., Janas v. Continental Cas. Co.*, 1999 WL 31006, at *6 (N.D.N.Y. Jan. 15, 1999); *Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.*, 862 F. Supp. 783, 792-93 (E.D.N.Y. 1994); *Quinn v. Blue Cross and Blue Shield*, 161 F.3d 472, 476 (7th Cir. 1998).  Based on this, Hippe claims that "where a plan's decision conflicts with the evidence before it, it is necessary for the plan to back up [its] conclusion by seeking additional support for the decision." (Pl. Mem. at 13.)  In this case, defendants did precisely what Hippe seeks, namely requesting that Dr. Landor, Hippe's own treating physician, assess his physical abilities.  Moreover, defendants reviewed Dr. Landor's notes submitted by Hippe.  The mere fact that plan administrators decide (perhaps wrongly) that a claim is unsupported does not compel them to seek out yet another independent medical expert to review the claim.  If defendants were wrong that Hippe's claim was unsupported, Hippe will need to prove that assertion at trial.

15

## **CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment and plaintiff's

cross-motion for summary judgment are denied.


Date:   July 31st, 2003
        Brooklyn, New York


I. L
Uni

Copies of the foregoing were sent on this day to:

John J. Palmeri
Palmeri & Gaven, Esqs.
55 John St.
New York, New York 10038

Kevin G. Horbatiuk
Russo Keane & Toner, LLP
26 Broadway – 28th Floor
New York, New York 10004

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

DARRELL HIPPE,

                            Plaintiff,

                v.

LIFE INSURANCE COMPANY OF NORTH
AMERICA, and CONTI-GROUP
COMPANIES,

                            Defendants.

------------------------------------------------------x

FINDINGS OF FACT REGARDING
PLAINTIFF'S MENTAL DISABILITY

02-CV-0086 (ILG)

GLASSER, United States District Judge:

       An evidentiary hearing was held before this court on December 1, 2006, at which

testimony was presented regarding the issue whether the plaintiff's mental disability in

1998 was of such a nature as to effectively render him incapable of performing his job as

a senior traffic coordinator for the Continental Grain Company ("Continental")[1] at the

time he left Continental's employment on July 13, 1998, and for six months thereafter as

required for benefits eligibility under the disability insurance plan offered by defendant

Life Insurance Company of North America ("LINA").[2]  At that hearing, Mr. Hippe and

his psychiatric expert, Dr. Joseph Barbuto, testified in support of the position that Mr.

Hippe was mentally disabled and unable to perform his duties at the time of his

departure from Continental and at all relevant times thereafter.  The defense called no

---

[1] Defendant Conti-Group Companies, Inc., is a successor in interest to
Continental.

[2] The facts of this case are set out in detail in this court's Memorandum and Order
dated July 31, 2003, familiarity with which is assumed.

1

witnesses of its own, but sought during cross-examination and by a subsequent written submission to the court to undermine the credibility of Mr. Hippe and Dr. Barbuto. For the reasons stated below, this court finds that the plaintiff was mentally disabled and unable to perform his duties at all times relevant to this litigation.

## SUMMARY OF TESTIMONY AND EVALUATION OF CREDIBILITY

### A. *Darrell Hippe*

On direct examination, Mr. Hippe testified that his responsibilities at Continental had involved such tasks as tracking inventory and preparing letters of credit, work which required a significant degree of attention to a variety of details and the ability to perform complicated mathematical calculations while under substantial of time pressure.[3] Mr. Hippe indicated that he was solely responsible for these tasks, and that although he had been a model employee who had done his work "flawless[ly]" in the years before his hospitalization in February 1998, the quality of his work declined to

---

[3] During the hearing, the court conducted its own examination of Mr. Hippe for the purpose of eliciting more detailed testimony regarding the degree of mental concentration and mathematical ability necessary to the performance of the plaintiff's duties at Continental. See Transcript of December 1, 2006 Hearing ("Tr.") at 33-42. Mr. Hippe's testimony indicated that his two primary responsibilities were, first, managing inventory, which involved arranging payment for barges of grain from various sellers, tracking that grain as it entered Continental's inventory system, and submitting monthly reports and spreadsheets to Continental's controller regarding the status of the grain inventory, and second, preparing and executing letters of credit, which involved calculating the amount of grain to be shipped and the payment due to Continental from numerous purchasers for each shipload of grain sent to various foreign countries and submitting lengthy documents detailing the grain inventory of each shipment to the consulate or embassy of each destination country. See also Affidavit of Darrell Hippe, dated August 27, 2004 ("Hippe Aff.") ¶¶ 5, 10-12, 14 (summarizing Hippe's various duties as senior traffic coordinator for Continental and discussing the high-pressure nature of that work).

unprecedented levels after he returned to work.[4]  Tr. at 18.  Mr. Hippe described feeling

"weak" and "depressed" upon his post-hospitalization return, explained that his

"concentration wasn't there" and that his "thinking level wasn't there," and recalled

being "angry with [him]self because [he] couldn't keep a clear mind."  Id. at 11.  He

testified that the medications he was taking for his various conditions caused him to

suffer "big side effects" including "dizziness," "fatigue[]," and "unclear thinking."  Id. at

11-12; see also Hippe Aff. ¶ 36 (discussing side effects of medication on Hippe's ability to

concentrate on his work).[5]  According to Mr. Hippe, the mental disability caused by his

physical illness and the side effects of his medication caused him to make "copious

quantities" of errors following his hospitalization in February 1998, which cost

Continental a substantial amount of money.  Tr. at 14; see also Hippe Aff. at ¶¶ 22-24

(discussing Mr. Hippe's inability to focus or perform mathematical calculations as he

previously had following his return to work in February 1998, and the detrimental effect

this had on his work).

The decline in Mr. Hippe's work was reflected in his poor performance evaluation

in April 1998.  Although Mr. Hippe did not provide as much detail regarding

Continental's employee evaluation system as the court might have preferred, the court

---

[4] Mr. Hippe indicated that at some unspecified point between his return to work
in February 1998 and his departure from Continental in July of that year, his supervisor
hired an assistant to help him with his duties.  However, Mr. Hippe testified that due to
the complexity of his work, he was unable to delegate the more demanding aspects of his
work to his assistant, and that those aspects therefore remained his sole responsibility.

[5] Mr. Hippe testified that, as of December 1, 2006, his regimen of medication
includes taking, by the court's count, 44 pills and at least one insulin injection each day,
and that he also wears a "neurogesic patch, which is a form of Morphine for [his] back
pain."  Tr. at 8-9.  Mr. Hippe testified that in 1998, he "was taking similar medications,
but not the exact same ones.  But a lot of same medications."  Id. at 6-7.

gathers from his testimony that the system was based on a numeric scale of one to four, in which a score of one was the best and a score of four was the worst. Mr. Hippe indicated that employees generally fell in the middle of the scale, testifying that "rarely anybody had got[ten]" a score of one, though he had received such a score once or twice, and that his supervisors at Continental "said that they had never [given] anybody a four." Tr. at 13. At his April 1998 evaluation, Mr. Hippe was given a four, and testified that he was "just appalled, seeing as they said they would never, ever, ever give anybody a four." Id. Mr. Hippe indicated that this experience made him feel "[h]orrible, depressed, [and] worthless." Id.; see also Hippe Aff. ¶¶ 25-27 (discussing Mr. Hippe's poor performance review and the additional anxiety it created). The plaintiff further testified to his mental disability at the time he left Continental, on the advice of his physician, in July 1998:

> Q      After you left the company, can you describe your ability to read and do mathematical formulas or things?...
> A      My concentration level is not— not nearly what it used to be at all. I— my train of thought is not there. I just cannot concentrate. I just— it seems to go in and out. It is just not there. And— nor was it the competence of range, doing my letters of credit. I couldn't concentrate on my work. I could not grasp the mental aspect of doing my charts, doing my profit— my gross profit analysis. I was continually making errors. I was making errors in my inventory, which I did flawless [sic] for, like, a solid ten years. I could find years that was known for doing flawless work, and now I was making errors that I could even find myself. And it was just— it was depressing to me that— that I couldn't even, in my mind, know where to start to look for these problems, the quantities of the— the problems, the mathematics.
> So the concentration was gone. And I just— it just upset me very much.

Tr. at 18-19; see also Hippe Aff. ¶¶ 28-34 (describing Hippe's mental state and inability to perform his work at the time he left Continental and filed a disability claim).

On cross examination and in their memorandum of law,[6] the defendants urge the court to disregard Mr. Hippe's testimony regarding his alleged mental disability in 1998, on the grounds that Mr. Hippe failed to initially report his mental difficulties to LINA or to his treating physician, that he lied in his disability application questionnaire insofar as his indication on that application that he played solitaire for fun is inconsistent with his testimony at trial that he did not regularly play solitaire at that time, that he lied during his testimony by first indicating that he prepared his affidavit in support of his application for benefits himself but later conceded that it was prepared by his attorneys, and that his general demeanor and lucidity at the evidentiary hearing undermine his claim of mental disability.  The court finds none of the defendants' arguments persuasive.  Although it is true that Mr. Hippe did not list "lack of concentration" on his November 1998 application for disability benefits, but mentioned it specifically for the first time in the disability questionnaire he completed in December 1998, it is understandable that an individual in Mr. Hippe's situation might interpret the insurance application's instruction to "please describe in your own words what is wrong with you"

---

[6] Although the court was prepared to issue its findings of fact from the bench at the conclusion of the December 1 hearing, defense counsel prevailed upon the court to delay its findings so that the defendants might submit a written memorandum addressing the weight that the court should give to Mr. Hippe's and Dr. Barbuto's testimony.  The defendants' inaptly-titled "Memorandum of Law," submitted on December 7, 2006, is an approximately three-page document stretched over six pages by the gratuitous use of page breaks, which simply reiterates without elaboration or citation to any legal authority the points that defense counsel raised during its cross-examination of Mr. Hippe during the evidentiary hearing.  The court is at a loss to understand what benefit the defendants expected the court to derive from this short restatement of arguments that were already before it, as the only evident effects of the defendants' tactic are the unnecessary delay of this case and the waste of judicial resources in preparing a written statement of findings of fact rather than making such findings on the record at the end of the December 1 hearing.

to refer to his many physical ailments, and neglect to mention the harmful effects that those ailments and his many medications had on his mental abilities. Moreover, the court might reasonably infer that Mr. Hippe's references to "extreme fatigue" and "dizziness" in his initial application implicitly include a statement that Mr. Hippe's physical impairments were negatively affecting his ability to concentrate on his work. Finally, the court finds that Mr. Hippe's reference to lack of concentration in his December 1998 disability questionnaire was not, as the defendants imply, a <u>post hoc</u> amendment tacked on to Mr. Hippe's list of ailments for the purpose of fortifying a fraudulent insurance claim, but rather simply an explication of the mental symptoms already implicit in Mr. Hippe's initial application. The defendants' argument that Mr. Hippe's testimony shows that he "lied" about playing cards in 1998, and its implicit suggestion that the ability to play a game of solitaire undermines Mr. Hippe's claim that he was unable to focus on the complicated mathematics required in his time-sensitive work environment, borders on the absurd. On page two of his December 1998 disability questionnaire, Mr. Hippe indicated "playing cards" as his only recreational activity, and testified at the evidentiary hearing that the game he usually played was solitaire. When defense counsel asked whether Mr. Hippe had problems concentrating on solitaire, or performing the mathematical calculations required by that game, Mr. Hippe responded first that he did have problems concentrating on solitaire "[f]or the short time I play it. I maybe play it, like, half a game," and thereafter explained that "I didn't really even play in the game.... I don't played [sic] solitaire as a daily game of playing cards." Tr. at 31. The court gathers from Mr. Hippe's responses that he did occasionally play solitaire, but that he had trouble completing even a single hand of the game and did not play it on a

regular basis in 1998. This is not inconsistent with his response to the 1998 questionnaire that he enjoys playing cards. In addition, the court is entirely unpersuaded by the defendants' tacit suggestion that the ability to play half a game of solitaire from time to time rebuts Mr. Hippe's assertion that he was unable to adequately perform his duties at Continental; quite obviously, the tasks that Mr. Hippe was called upon to perform at Continental required mental acuity of a far greater magnitude than does the occasional unfinished card game played in one's home and in the absence of any time pressure. The defendants' argument that Mr. Hippe lied during cross-examination about the preparation of his 2004 affidavit is similarly disingenuous. The transcript, as well as this court's recollection of Mr. Hippe's demeanor during the hearing, indicate that Mr. Hippe was simply confused by Mr. Horbatiuk's questions, not that he was intentionally trying to deceive the court or the defendants. See Tr. at 26-27. Although Mr. Hippe initially answered "[n]o" to Mr. Horbatiuk's question, "did anyone assist you in preparing this document [i.e., the Hippe Affidavit]?," his subsequent answers make clear that he did not prepare the document himself, but rather provided the information contained therein to his attorneys, and reviewed and signed the affidavit that they prepared. Id. at 26. This is a common practice, and Mr. Hippe's answers, construed in context, simply are not consistent with the defendants' suggestion that he initially sought to deceive the court by denying that his attorneys participated in the drafting of the Hippe Affidavit. Finally, the defendants' argument that "Mr. Hippe's very demeanor in Court belies his claim of cognitive impairment" is both inaccurate and irrelevant to the issue before the court. Def. Mem. at 3. Although Mr. Hippe presented a poised and articulate account of the physical and mental difficulties that compelled

him to leave Continental's employment and apply for disability benefits, the court does not find that his behavior was inconsistent with the sort of mental impairments that he claims to suffer.  Moreover, the fact that he was able to conduct himself well during a brief evidentiary hearing in 2006 tells the court nothing whatsoever about the veracity of his claim that he was unable to adequately perform his occupational duties in 1998.  As Mr. Horbatiuk reminded the court and plaintiffs' counsel during the hearing, the issue before the court is that of Mr. Hippe's mental condition in 1998, not his mental condition today.  See Tr. at 16 ("MR. HORBATIUK: The whole issue before the Court is whether... [Mr. Hippe] was disabled for mental condition at the time in 1998."), 49 (sustaining Mr. Horbatiuk's objection to Dr. Barbuto's testimony as to Mr. Hippe's current condition on the ground that "[w]e are dealing with a condition that existed not in '98 again.").  Therefore, any inferences that the court might draw regarding Mr. Hippe's current mental state from his appearance and demeanor at the evidentiary hearing are entirely irrelevant to the issue of his mental condition in 1998.

**B.**     ***Dr. Joseph Barbuto***

On direct examination, Dr. Barbuto testified that he had examined Mr. Hippe twice in the past year, first on January 23, 2006, and then on October 30, 2006, and added that in addition to examining Mr. Hippe and discussing Mr. Hippe's medical history and the circumstances surrounding his departure from Continental at those examinations, he reviewed and based his psychiatric opinion in part on the Hippe Affidavit, this court's July 31, 2003, order denying both parties' motions for summary judgment, and a letter that Mr. Hippe sent to a case manager at Cigna Group Insurance. Following his examinations of Mr. Hippe, Dr. Barbuto produced two reports, received in

evidence as Plaintiffs' Exhibits 4 and 5, in which he concluded, <u>inter alia</u>, that

> within a reasonable degree of psychiatric certainty Darrell Hippe was depressed and demoralized in late 1997 and 1998 because of his increasing inability to work. He was unable to work because of his physical disabilities, but as well, he suffered cognitive dysfunction due to his shortness of breath, dizziness and certain medications. That cognitive dysfunction took the form of poor concentration, inability to focus, mental confusion and reduced intellectual ability. In addition, some of these medications and his early emotional reaction to his physical (especially chronic pain) and cognitive difficulties caused him to become depressed and anxious at that time, which also contributed to his inability to work.

Ex. 4 at 2. His report further concluded that "in 1998 and thereafter, Darrell Hippe was incapacitated by physical symptoms and, within a reasonable degree of psychiatric certainty, by mental symptoms," and diagnosed Mr. Hippe as suffering from three "cognitive and mood disorders," identified as "293.83– Mood disorder due to general medical condition and its treatments," "309.28– Adjustment disorder with mixed anxiety and depressed mood," and "294.9– Cognitive disorder NOS (not otherwise specified)." <u>Id.</u> at 3. Dr. Barbuto repeated these diagnoses at trial, and testified that "within a reasonable degree of psychiatric certainty," he did not believe that Mr. Hippe was capable of performing his job functions in 1998, and that he believed Mr. Hippe's disabilities to be of a permanent nature. Tr. at 48.

On cross examination and in their memorandum of law, the defendants' primary criticism of Dr. Barbuto's psychiatric opinion is that it is admittedly based on Mr. Hippe's own account of his medical history and symptoms, which Dr. Barbuto made no attempt to independently verify. The defendants argue, first, that Dr. Barbuto's testimony should be entirely disregarded "because he skewed the truth as to whether he reviewed any of the plaintiff's medical records in formulating his medical opinion." Def. Mem. at 4. This

assertion is based on Dr. Barbuto's first report, dated February 3, 2006, which indicates that the doctor was "asked to review certain medical records and history," and identifies the "Sources of Information" upon which his report relies as, <u>inter alia</u>, "records sent to me in mid-December, 2005." Ex. 4 at 1.  Because Dr. Barbuto conceded at the evidentiary hearing that he did not examine the notes or records of Mr. Hippe's treating physician, Dr. Michael Landor, or any other source of medical information except Mr. Hippe's own statements concerning his medical condition, the defendants argue that the statement in Dr. Barbuto's report that he consulted "medical records" "made the Court believe that he referred to Dr. Landor's medical records from 1998 when he concluded that Mr. Hippe was mentally disabled, but he in fact never did."  Def. Mem. at 4.  The court believes that the defendants are overstating their case; although the use of the term "medical records" to refer to documents such as this court's order denying summary judgment and the Hippe Affidavit is not a model of transparency, the court is persuaded by Dr. Barbuto's candor and demeanor while testifying that this reference is nothing more sinister than a poor choice of words, rather than an intentional effort to mislead the court.  In any event, Dr. Barbuto clarified the issue at the evidentiary hearing, so that the court may now assess the reliability of his report with an accurate understanding of the documents upon which he relied when preparing it.  The defendants' second criticism of Dr. Barbuto's psychiatric testimony– that it is inherently unreliable because, without seeking objective and independent confirmation of Mr. Hippe's medical history and life circumstances rather than accepting Mr. Hippe's word on all such matters, Dr. Barbuto's analysis is vulnerable to the possibility that Mr. Hippe simply told the doctor what Mr. Hippe believed he needed to say in order to obtain a favorable psychiatric opinion–

carries somewhat more weight.  Mr. Horbatiuk discussed the psychiatric concept of "secondary gain," which he characterized as the phenomenon in which "[i]f I derive again [sic] from having you conclude something about me, then I will try to get you to conclude that about me."  Tr. at 62.  He further suggested that "when someone has a lawsuit where they are seeking to obtain money, that is a situation which classically gives rise to secondary gain," a point that Dr. Barbuto did not concede, but which seems obvious to the court.  Id. at 63.  Nevertheless, while the court may have less confidence in Dr. Barbuto's conclusions than it would have had he independently verified Mr. Hippe's medical history and the "baseline" work ethic and job performance history from which he concluded that Mr. Hippe's post-hospitalization performance was a "very big change," it finds Dr. Barbuto's opinion sufficiently reliable and persuasive to meet the plaintiff's burden of establishing the element of mental disability in 1998 by a preponderance of the evidence.[7]  Id. at 63-64.  As the court noted at the December 1 hearing, the defendants have had ample opportunity to have Mr. Hippe examined by their own medical experts for the purpose of challenging Dr. Landor's and Dr. Barbuto's conclusion that he was unable to work due to physical and mental disability in 1998.  Rather than avail themselves of that opportunity, they have instead sought only to undermine the validity or reliability of the opinions of the physician and psychiatrist who have examined Mr. Hippe, by pointing out that various cognitive tests that could have been performed were not, or that Dr. Barbuto's methodology has some potential for abuse by a mendacious plaintiff.  In the absence of any contradictory medical testimony or evidence that Mr.

---

[7] This conclusion is based in part upon the court's own observation and assessment of Mr. Hippe's testimony, which, as discussed above, it finds to be credible.

11

Hippe actually misrepresented his history and symptoms to Dr. Barbuto, the court finds that the defendants have failed to rebut the plaintiff's <u>prima facie</u> showing of mental disability.

## <u>CONCLUSION</u>

On the basis of the testimony presented on December 1, 2006, and the exhibits submitted in support of that testimony, this court finds that the plaintiff, Darrell Hippe, was mentally disabled at all times relevant to this litigation, to a degree that rendered him incapable of performing the duties of his job as a senior traffic coordinator at the Continental Grain Company.


Dated:        Brooklyn, New York
              December 29, 2006


                        _____/s/_____

                        I. Leo Glasser, U.S.D.J.